### WOODS *vs.* LAWRENCE COUNTY.

1. Where the charter of a railroad company authorizes the counties "through which it may pass" to subscribe to its stock, a county lying between the two termini of the road may subscribe without waiting until the route is actually located.

2. If the statute requires the grand jury to fix the amount of the subscription and to approve of it, and upon their report being filed empowers the commissioners to carry the same into effect by making the subscription in the name of the county, and if these things be done agreeably to the law, the county cannot afterwards deny its obligation to pay the amount subscribed.

3. Where the charter provided that payment of the stock should be made upon such terms and in such manner as might be agreed on between the company and the county, an agreement to pay in bonds, with coupons attached for the semi-annual interest, is binding, and the bonds being issued accordingly, are lawful and valid securities.

4. In a suit brought to recover the arrears of interest on such bonds it is not necessary for the holder to show that the grand jury fixed the manner and terms of paying for the stock; nor is it a defence for the county to show that the grand jury omitted to do so. It is enough that the manner and terms of payment were agreed upon between the company and the commissioners.

5. In a suit brought upon the coupons by a *bona fide* holder his right to recover is not affected by the fact that the railroad company sold the bonds at a discount of twenty-five per cent., contrary to the charter, which forbids the sale of them at less than their par value.

This was an action of debt brought in the Circuit Court of the United States for the western district of Pennsylvania, by Alexander G. Woods, a citizen of New York, against the county of Lawrence, in the State of Pennsylvania, to recover the amount of certain coupons for interest on bonds given by

the defendant. to the Northwestern Railroad Company. The defendant denied its obligation to pay the coupons or the bonds. .

The plaintiff, to maintain the issue on his part, gave in evidence the act of the Pennsylvania Legislature by which the Northwestern Railroad Company was incorporated. Section 1 appointed. certain persons therein named to open books, receive subscriptions, and organize a company with all the powers and subject to all the duties, restrictions, and regulations prescribed by the general railroad law of the State. Section 2 fixes the capital stock at 20,000 shares of $50 each, to be increased to $2,000,000 hereafter, if found expedient. Section 3 fixes the termini and prescribes the gauge, &c., of the road to be built. Section 4 authorizes the company to use any section of five miles when finished, as fully as the whole might be used if it were all finished. The remaining three sections of the act are as follows:

"SECTION 5. That said company be, and they are hereby, authorized to borrow money to an amount not exceeding the capital stock of said company, upon bonds to be issued by said company, whenever the said president and directors shall deem the issue of such bonds expedient: *Provided*, That the rate of interest on said bonds shall not exceed seven per centum per annum, and that said bonds shall be convertible into the stock of said company, at the option of said company and the holder or holders of said bonds, and that no bond shall be issued for a sum less than one hundred dollars.

"SECTION 6. That the president and directors of said company are hereby authorized to pay to the stockholders, in the months of January and July in each year, interest at the rate of six per centum per annum on all instalments paid by them, and to continue to pay the same until the road shall be completed; and all the profits or earnings of the said railroad within the said time, shall be credited to the cost of construction; and all interest paid shall be charged to the cost of construction; but no interest shall be paid on any share of stock upon which any instalment that has been called for remains

unpaid, and the stock of said company shall not be subject to any tax in consequence of the payment of the interest hereby authorized, nor until the net earnings of the company shall amount to at least six per centum per annum upon the capital invested.

"SECTION 7. That the counties through parts of which said railroads may pass shall be, and they are hereby, severally authorized to subscribe to the capital stock of said railroad company, and to make payments on such terms and in such manner as may be agreed upon by said company and the proper county: *Provided,* That the amount of subscription by any county shall not exceed ten per centum of the assessed valuation thereof; and that before any such subscription is made, the amount thereof shall be fixed and determined by one grand jury of the proper county, and approved by the same. Upon the report of such grand jury being filed, the county commissioners may carry the same into effect, by making, in the name of the county, the subscription so directed by the said grand jury: *Provided,* That whenever bonds of the respective counties are given in payment of subscriptions, the same shall not be sold by said railroad company at less than par value, and no bonds shall be in less amount than one hundred dollars; and such bonds shall not be subject to taxation until the clear profits of said railroad shall amount to six per cent. upon the cost thereof; and that all subscriptions made, or to be made, in the name of any county, shall be held and deemed valid, if made by a majority of the commissioners of the respective counties.

It was proved that the grand jury of Lawrence county, on the 21st of May, 1853, passed a resolution *recommending* that the county commissioners "subscribe stock to the Northwestern Railroad to the amount of $200,000, agreeably to the act of Assembly incorporating said company, and to issue bonds for the payment of said stock, making the conditions such as will best promote the interest of said railroad company and the county of Lawrence."

On the 20th of August, 1853, the county commissioners

*Woods* vs. *Lawrence County.*

subscribed $200,000 for the county to the capital stock of the railroad company, by affixing their names and their official seal to the following instrument:

"By authority of an act of the General Assembly of the Commonwealth of Pennsylvania, passed the 9th day of February, A. D. 1853, entitled 'An act to incorporate the Northwestern Railroad Company,' and by virtue of the action of the grand jury of the county of Lawrence had at May session, A. D. 1853, at the court of said county, fixing and determining the amount of subscription to be made to the said Northwestern Railroad Company by said county of Lawrence, we, the undersigned, commissioners of said county, do hereby subscribe, for and in the name of the county of Lawrence, to the capital stock of the Northwestern Railroad Company, the sum of two hundred thousand dollars, being four thousand shares in said capital stock. It is understood that whenever the amount of this subscription is required from the county of Lawrence by the said company, it is to be paid in the bonds of this county; to be given in sums of not less than one thousand dollars each, payable in twenty years after date, or such other time after date as may be agreed upon between the commissioners of Lawrence county and said railroad company. The interest on said bonds to be paid semi-annually, and said interest to be paid by said railroad company until such time as the Northwestern Railroad is completed.

"In testimony whereof we have hereunto set our hands and affixed the seal of the said county of Lawrence, this 20th day of August, A. D. one thousand eight hundred and fifty-three."

To pay this subscription, bonds were signed, sealed and delivered to the railroad company in the following form:

"Know all men by these presents, that the county of Lawrence, in the Commonwealth of Pennsylvania, is indebted to the Northwestern Railroad Company, in the full and just sum of one thousand dollars, which sum of money said county agrees and promises to pay, twenty years after date hereof, to the said Northwestern Railroad Company, or bearer, with interest at the rate of six per cent. per annum, payable semi-annually, on the first day of January and July, at the office

of the Pennsylvania Railroad Company in the city of Philadelphia, upon the delivery of the coupons severally hereto annexed; for which payments of principal and interest, well and truly to be made, the faith, credit, and property of said county of Lawrence are hereby solemnly pledged, under the authority of an act of Assembly of this Commonwealth, entitled 'An act to incorporate the Northwestern Railroad Company,' which said act was approved the ninth day of February, A. D. eighteen hundred and fifty-three.

"In testimony whereof, and pursuant to said act of the Legislature of Pennsylvania, and resolution of the county commissioners, in their official capacity, passed the —— —— —— ——, the commissioners of said county have signed, and the clerk of said commissioners has countersigned these presents, and have hereto caused the seal of said county to be affixed this —— day of ——, A. D. one thousand eight hundred and fifty——."

To each of these bonds forty coupons were attached, of which the following is a specimen:

"COUNTY OF LAWRENCE.

"Warrant, No. 37.                           For thirty dollars.
Being for six months' interest on bond No. —, payable on the first day of January, A. D. 1873, at the office of the Pennsylvania Railroad Company in the city of Philadelphia.
$30.                           ——— ———, Clerk."

On the part of the defendant, it was not only proved, but it was conceded by the plaintiff to be true, that the presentment or recommendation of the grand jury was made before the railroad company was organized; that the subscription by the commissioners was made before the railroad was located, and that, in fact, the railroad or any part of it never was located within the limits of Lawrence county. It was also proved that the bonds of the county, after they came into the hands of the railroad company, were disposed of, not at their par value, as the act of incorporation requires, but for seventy-five per cent. of that value.

The defendants on these facts asked the Circuit Court to charge that—1. The county was not authorized by the act of

*Woods* vs. *Lawrence County.*

Assembly to make this subscription. 2. The subscription is void because the grand jury did not prescribe the manner and terms of payment. 3. The county was not authorized to issue the bonds. 4. The sale of the bonds, contrary to law, at a less price than par, avoided them in the hands of the purchaser.

Upon the points of law the judges of the Circuit Court differed in opinion, and made a certificate of their division, which brought the cause into this court.

*Mr. Smith,* of Pennsylvania, for the plaintiff. The constitutional authority of the State of Pennsylvania by her Legislature to delegate to a county or its officers the power of making a subscription to a railroad company, and to pay for such subscription in bonds of the county, is not an open question, and is not raised here. Two questions are raised, and these are—1. Whether the act in evidence does give the authority; and, 2. Whether the fact that the bonds were sold by the railroad company at less than their par value destroys the plaintiff's right to recover. Of these two questions in their proper order:

I. The county, represented by its commissioners, or a majority of them, is authorized " to subscribe to the capital stock of said railroad company, and to make payments on such terms and in such manner as may be agreed upon' by said company" and said county. That this language, although general and somewhat indefinite, will include the power as exercised by the commissioners of Lawrence county in issuing the bonds in question in this case, and is intended so to do, hardly seems to admit of doubt. No one supposed that any county or municipal corporation could subscribe to the stock of any railroad company in any other way than by borrowing money upon its credit. This could only be done by the issue of bonds, or some other sort of securities, well known in the money market. The counties had neither silver nor gold with which to pay their subscriptions. The only "manner" in which they could " make payment," was by the issue of their promises to pay. The form of bonds payable to bearer, with coupons attached, was the most convenient to all interested, and such securities

were most available in the money market.   That the Legisla-
ture intended to give to the commissioners of the several coun-
ties described in the act, authority to issue bonds similar to
those in dispute, is evident from the second proviso of the sev-
enth section  which provides that " the bonds of the respective
counties, given in payment of subscriptions, shall not be sold
by said railroad company at less than their par value."   The
county, the railroad company, and all parties concerned, so
understood the authority given, and have acted under it ac-
cordingly.   The bonds have been issued, put into the market,
and sold to the highest bidder, without a word of dispute as
to the power of the commissioners to make them, until such
time as repudiation became more convenient than payment.

This question has been before the Supreme Court of the
State of Pennsylvania, and the authority of the commissioners
of Lawrence county to issue the very bonds in dispute has been
sustained.   *The County of Lawrence* vs. *The Northwestern Rail-
road Company et al.,* (8 Casey, 144;) *Diamond* vs. *Lawrence County,*
(1 Wright, 353.)   In the last case Mr. Justice Woodward, in
giving the opinion of the Supreme Court of Pennsylvania upon
the que-tions which arose, says : "It is not necessary for us to,
discuss the irregularities of the subscription made by the
county, nor the authority of the county to make it.   In the
case in 8 Casey, the subscription was held to be valid, and we
should, doubtless, reach the same conclusion again if we were
to review the whole ground.   But because it is not necessary
we forbear to do it."   The act has been passed upon, and the
validity of similar subscriptions for railroad purposes has been
affirmed also by the Supreme Court of the United States in
*Curtis* vs. *The County of Butler,* (24 How., 435.)

On the question of authority in the county to make the sub-
scription, it is objected, " that the presentment or recommen-
dation of the grand jury was materially deficient in not set-
ting forth or prescribing the terms and manner of payment,
and the subscription, consequently, was void, for want of au-
thority."

The act requires that the amount of the subscription " shall
be fixed and determined by one grand jury of the proper county,

*Woods vs. Lawrence County.*

and approved by the same." A grand jury of Lawrence county resolved that the commissioners be, and are hereby, recommended to subscribe two hundred thousand dollars to the stock of the railroad company, and to issue bonds for the payment of said stock, making the conditions such as will best promote the interests of both parties. This is a substantial if not a literal compliance with the terms of the act, and was accepted and acted upon as sufficient to give the commissioners the authority to make the subscription.

II. The validity of the subscription and the issue of the bonds in question having been established, we come to the second point to be discussed: How far are these bonds affected by the second proviso of the seventh section of the act, "that whenever bonds of the respective counties are given in payment of subscriptions, the same shall not be sold by said railroad company at less than their par value?" The fact that the plaintiff is a *bona fide* holder of the bonds in dispute, for a valuable consideration, was not put in issue upon the trial.

As between the county and the railroad company, the defence set up by the county would be good *pro tanto* at least, but it is difficult to see how it can affect a *bona fide* holder, for a valuable consideration without notice. The bonds have been given to the company in payment of stock; the company has received them at their par value. If the bonds, however, which have been received as cash are not of that value, a fraud has been practised upon other stockholders, who paid in money, or its equivalent. But the bonds being made payable to bearer, and thus made negotiable securities, the county will have to pay them and the interest thereon, whether they have purchased a hundred dollars' worth of work or only seventy-five. The proviso that the bonds shall not be sold at less than their par value is not a condition precedent that can affect the covenants upon them. That proviso assumes that the bonds have been issued and given in payment of stock, dollar for dollar, and imposes the prohibition upon both the county and the railroad company. The county should not have subscribed, nor should the railroad company have received their securities, unless they were equivalent to the cash paid by other stockhold-

ers. If it were not intended by the Legislature, and expected by the county and the railroad company, that these bonds should be negotiable in the money market, the proviso was unnecessary. The railroad company may have violated the provisions of the act, and committed a fraud upon the county and other stockholders; that is a question among them. These bonds have been thrown upon the money market. They have passed from hand to hand, as other negotiable securities, until they have come into the possession of the plaintiff. He calls upon the makers of these securities to pay them according to their stipulations; the county cannot make successful defence by setting up fraud or a violation of the provisions of the act on the part of the railroad company. The purchaser of the bonds was required to look to the face of those instruments alone for the terms upon which he took them. He was bound to inquire whether they had been executed by persons having authority to pledge the faith and credit of the county. Their delivery could be presumed from the fact that they were found in the market.

The Supreme Court of Pennsylvania occupies a peculiar position upon the question of the negotiability of securities similar to the bonds in controversy. In the case of *Carr* vs. *Le Fever*, (3 Casey, 413,) Mr. Chief Justice Lewis, in giving the opinion of the court, says: "We do not desire to have any doubt on the question whether the holder of bonds issued by a corporation, payable to bearer, may maintain an action on them in his own name. Such bonds are not strictly negotiable under the law merchant, as are promissory notes and bills of exchange. They are, however, instruments of a peculiar character, and being expressly designed to pass from hand to hand, and by common usage actually so transferred, are capable of passing by delivery so as to enable the holder to maintain an action on them in his own name." In the case in 8 Casey, already referred to, the parties and the court seem to have regarded these bonds as negotiable and in the hands of *bona fide* holders, and not subject to equities between the county and the railroad company. The proceedings are based upon the assumption that the county will be bound to pay the par value

of any of the bonds which may have been passed off by the railroad company, although disposed of fraudulently and in violation of the provisions of the act. How, upon any other assumption, could the court have decreed in that case that the company should return the bonds in their possession to the county and pay the par value of those which had been put into circulation? But in the case of *Diamond* vs. *Lawrence County*, (1 Wright, 353)—decided since this case was tried in the Circuit Court—they have taken the broad ground that "such bonds have not the quality of commercial paper in Pennsylvania; they are but bonds, and, even in the hands of innocent and remote purchasers, they are subject to the equities existing against them, when in the hands of the first purchasers from the company. The interest coupons are subject to the same equities." In this position, as they admit, "they stand alone; all the courts, American and English, are against them." It is respectfully submitted that this decision is not binding upon the Supreme Court of the United States. The doctrine of *lex loci contractus* does not apply here. In questions of a purely local character, the decisions of the State judicatories should, perhaps, govern; but, although these bonds may be said to be creatures of the Legislature of Pennsylvania, so soon as they were thrown upon the market they put off their local and assumed a character as broad as commerce itself.

*Mr. Taylor* and *Mr. McCoomb*, of Pennsylvania, for defendant. The power to subscribe was not given to the county of Lawrence by name, but only to those counties "through parts of which said railroad may pass." A county through which it may not pass has certainly no authority by this act to subscribe. It is a contingent power, which may or not take effect upon the happening or not happening of an uncertain future event, and it remains in abeyance until the event occurs. *Dartmouth College Case*, (4 Pet. Cond. Rep., 575.) In point of fact, it had not occurred at the time when the subscription was made. The railroad was not then located in the county or in any part of the county. It has not yet been located; it probably never will be. It is confidently submitted, that for this

reason the power did not and does not exist to make the subscription.

It is unreasonable to understand the words of this act in a sense which would justify such a subscription before the road is located. Even if the grand jury and commissioners could be sure that the road would pass through some part of the county, it may be that it will pass through an insignificant corner of it. Before an actual and final choice of the route it is impossible to say how much ought to be subscribed; for until then no one can tell how much benefit or injury the construction of it may do to the public interest of the county. In determining what the action of the county authorities ought to be the locality of the road is an indispensable and decisive element, without which no calculation approaching to the truth can be made.

To say that Lawrence county has power to subscribe because it is one of the counties through which it *may* pass—that is, one of those in which it is *possible* that a part of the road may be located—is a proposition wholly untenable. It may pass through any one of nine counties, but it is not possible that it should pass through all of them. Had all these counties the power to subscribe? If all of them had subscribed on the assumption that each one was to have the road running through it, some of them would certainly have cheated themselves, and exercised a power never conferred by law. The court avoids this absurdity by simply declaring that a county through which the railroad may pass is one in which the route of it has been located and some progress made in the building of the road.

This construction is also objectionable on constitutional grounds. In the celebrated case of *Sharpless* vs. *Philadelphia,* (21 Penn. St. Rep., 147,) the constitutionality of an act like this was put on the legislative power of taxing, and to make it an exercise of the taxing power it must be a burden imposed upon the people of a district which has a special interest in the public improvement to which the revenue raised is intended to be applied. Lawrence county could have no special interest in this road unless it passed through her territory. The existence of that interest was the test of her power to subscribe,

and the extent of it was the only measure by which the pru-
dence of exercising the power could be judged of.   This court
has declared that if a law admits of two interpretations, one of
which brings it within and the other presses it beyond the con-
stitutional authority of the Legislature, it is the duty of the
courts to adopt the former construction.   *United States* vs. *Coombs*,
(12 Pet., 76.)

Granting that if the whole road were made, it must neces-
sarily pass through Lawrence county; still, the whole road
may never be made.   The third section of the charter author-
izes a connection with any other road at any intermediate
point on the line, and the fourth section enacts that when *five
miles are completed* it may be used as if the whole were finished.
The company has the *right* to make a road from some point,
selected by itself, on the Pennsylvania railroad west of Johns-
town, to the Ohio State line.   But there is nothing to prevent
it from making five miles in Allegheny county, connecting at
one end with the Pennsylvania railroad, and at the other with
the Allegheny Valley railroad.   Will this court say that such a
Northwestern railroad in contemplation of law passes through
Lawrence county?   Can it be tolerated that such a monstrous
fiction shall be used for the mere purpose of plundering the
public and enriching unscrupulous speculators?

Again: it is contended by the plaintiff that the road was
located through the county before subscription, "because the
company itself, by the very act of accepting the subscription,
had determined upon the completion of the road through at
least a part of the county."   This proposition, when analyzed,
amounts to this: the acceptance of a subscription from the
county is a contract by the company to locate the road through
the county, and a contract to locate is equivalent to a location.
But "a stipulation for a particular route of the projected rail-
way is, in other respects, against the policy of the law, and
therefore illegal."   *Pittsburg and Steubenville Railroad Co.* vs.
*Biggar*, (10 Casey, 458.)   Now, to say that an illegal contract
to locate is equivalent to a location is absurd.   Besides, the
proposition under discussion is, that there was no power to
subscribe until after location; hence, to say that there was a

location by virtue of the subscription, and that there was power to subscribe by virtue of the location, is but reasoning in a vicious circle.

The power to issue the bonds in question is not given to the county by the act incorporating the railroad company. This is a power which must be given in the most direct and unmistakable manner, either in express words or by necessary implication. A doubtful charter does not exist, because whatever is doubtful is decisively certain against the corporation. *Commonwealth* vs. *Erie & N. E. Railroad Co.*, (3 Casey, 351.)

Again: plaintiff finding no rest for the sole of his foot in the express words or necessary implication of the statute, plants himself upon the agreement of the parties, and says the county was authorized to make payments in such manner as might be agreed upon by the company and the county. Coupon bonds were so agreed upon; the county was therefore authorized to issue them. This argument is quite fallacious. The power to issue bonds is one thing; the exercise of that power is another. If there were power in the county to issue bonds, then the agreement of the parties might make bonds a manner of payment, but it is preposterous to say that the power was given merely because it was assumed.

The true force and effect of the clause authorizing the parties to agree upon the manner and mode of making payment will be clearly evinced by ascertaining the difficulty intended to be overcome thereby. Now, this railroad company was incorporated, " subject to all the duties, restrictions, and regulations" prescribed by the general railroad law of 1849. If we turn to that law, section 8, it is found that the railroad company is restrained from accepting any subscription upon any other terms than those therein prescribed. These terms were, " to be called in and paid at such times and places and in such proportions and instalments, not, however, exceeding five dollars per share, in any period of thirty days, as the directors shall require." If, therefore, the enabling act had stopped short with the simple grant to the county of authority to subscribe, any subscription made must have been subject to the terms aforesaid; not because the county had no power

to bargain for others, (for her authority was unrestricted in that respect, as that of a natural person,) but because the company had no authority to accept. To suppose that a county, whose means of payment could be accumulated only by the slow process of taxation, would subscribe any considerable amount of stock, subject to the calls and forfeitures in said section mentioned, was simply absurd. Wherefore, that the company might take any benefit under the grant of authority to the county to subscribe, it was necessary that the company itself should be authorized to accede to a subscription, to be paid "at such times and places, and in such proportions and instalments," as, by the county, was thought practicable, having regard alone to its ordinary source of revenue, taxation; we say ordinary, because the extraordinary method of recourse to loan is not even hinted at, much less authorized, in the act. A release, then, to the company from the statutory restraint aforesaid was the object in view. To this end, the clause "and to make payments," &c., was introduced; and the object was supposed to be accomplished, when thereby the consent of both parties as to terms and manner of payment was substituted for the arbitrary calls of the directors of the company, as provided in the statute. In purport or effect the clause conferred no new or additional power upon the county; it only removed from the company a legal disability.

But let it be conceded that the statute authorizes the issuing of bonds, what manner of instrument is to be understood as designated by that word? An instrument executed and delivered by the obligor, signed and sealed by him, not legally assignable in any but the one way provided by the act of 1715, that is, under the hand and seal of the obligee, before two credible witnesses, and when assigned, subject to all the equities then existing between the original parties:—such is a bond in law, in equity, and in the popular sense of the word. It would be so understood by the members of the Legislature when they voted for the bill. It is a term of art, too; and terms of art are to be understood in their technical sense when used in a statute. *Brockett* vs. *Ohio and Pennsylvania Railroad Co.*, (2 Harris, 143;) *Ketchum* vs. *Tyson*, (3 Murphy, 314;) *Smith* vs.

*Harman,* (6 Mod., 143;) 9 Bac. Abridg., 238, 244. A coupon bond could not have been contemplated by this act. The variable law merchant may, if it will, adopt and protect these specialties as commercial paper, but statute laws must be executed according to the sense and meaning they had at the time they were passed. *Commonwealth* vs. *Erie & N. E. Railroad Co.,* (3 Casey, 339.) The difference between a bond in its true sense and an instrument such as this, which leaves the county naked and defenceless against the frauds of the railroad company, is one of unspeakable importance.

The provision in the charter that the bonds should not be sold by the railroad company for less than their par value is a condition of their validity. The words of the statute are part of the bond, and incorporated with it, and those words are apt and proper to create a condition. *Bear* vs. *Whisler,* (7 W., 19;) *Westenberger* vs. *Reist,* (1 Harris, 598; 2 Coke Litt., 223;) *Smith* vs. *Bowditch M. F. Ins. Co.,* (6 Cush., 448; Angell on Ins., 189;) *Hamilton* vs. *Elliott,* (5 S. & R., 375; 2 Pars. on Cont., 15;) *Thomas* vs. *Commissioners of Allegheny,* (8 Casey, 229;) *Lawrence County* vs. *N. W. Railroad Co.,* (8 Casey, 152.) The consequence of a breach of the condition subsequent is to rescind, annul, and make void the obligations of the bond, and equity will not relieve against such a forfeiture of what, otherwise, might have been the right of the obligee.

*Mr. Hamilton,* of Pennsylvania, in reply. As to the defendant's proposition, " That there was no authority vested in the county of Lawrence to make subscription to the stock of said Northwestern Railroad Company; and that the bonds are consequently void;" we answer, that this defence was overruled twice by the Supreme Court of Pennsylvania, in cases involving directly the validity of this same subscription and the bonds issued in pursuance thereof. *Commonwealth ex rel. Lawrence County* vs. *The Northwestern Railroad Co.,* (8 Casey, 144,) and *Diamond* vs. *Lawrence County,* (1 Wright, 353.) In the first of these cases the court say, in the opinion delivered by the Chief Justice, that "notwithstanding the unskilfulness and inexperience with which this affair was managed by the

county authorities, we think that enough was done to constitute a valid subscription to the capital stock of the company, and thus to furnish a valid basis for the issuing of the bonds." In the other case, the same doctrine was reaffirmed.

The power to execute and issue bonds or other certificates of indebtedness belongs to all corporations, public as well as private, and is inseparable from their existence. *Commonwealth ex rel. Reinboth* vs. *D. Fitzsimmons et al., members of the Select and Common Councils of the City of Pittsburg*, in the Supreme Court of Pennsylvania—(not yet published.)

The authority given by the Commonwealth to the defendants to incur the debt or obligation by subscription, necessarily included the authority to give the creditor the usual evidences of a debt.—*Ibid.*

In the case just cited there was authority to the city of Pittsburg to subscribe to the capital stock of the Allegheny Valley railroad, but no express authority to issue bonds in payment thereof. The city executed and delivered to the company, in payment of the subscription, its bonds payable to bearer, with coupons annexed, and the Supreme Court held them to be valid, notwithstanding the absence of express authority to issue them. We submit, therefore, that the question has been authoritatively decided against the county, and is not now open to discussion upon general principles.

It is alleged by the defendant: "That the sale of the bonds of Lawrence county, given in payment of her subscription, below their par value, contrary to the provisions of the act of Assembly, by the railroad company, avoided the bonds in the hands of the purchaser."

The same defence was made to these and similar bonds in several cases, in the Supreme Court of the State, and overruled. In the *Commonwealth ex rel. Lawrence County* vs. *The Northwestern Railroad Company*, the relator obtained a money decree against the defendant for the bonds which it had negotiated below par. This decree could only have been rendered upon the hypothesis that the bonds were obligatory on the county in the hands of *bona fide* holders. In the *Comm. ex rel. Thomas* vs. *The Commissioners of Allegheny County*, (8 Casey,

218,) affirmed in *The Comm. ex. rel.* vs. *The Select and Common Councils of Pittsburg,* (10 Casey, 496;) *The Comm. ex rel. Armstrong* vs. *The Commissioners of Allegheny County,* (1 Wright, 277;) *The Comm. ex rel. Middleton* vs. *Same,* (1 Wright, 237;) and *Same ex rel. Reinboth* vs. *Same* (not yet reported,) the court held that the sale of the bonds by the railroad companies below par, in violation of the prohibition contained in the statutes which authorized their issue, might be a good defence as an equitable defalcation, on behalf of the obligors, against the principal of the debt, but not against the interest.

There are exceptions to the rule that the assignee of an ordinary bond takes it subject to a right in the obligor to defalcate against the assignor, or show want of consideration or non-existence of the debt. As when the bond is delivered to the obligee to enable him to raise money, or the obligor encourages the transfer of it. *Eldred* vs. *Hazlett,* (9 Casey, 307.) Nor has the assignee anything to do with agreements between the original parties inconsistent with the purport or legal effect of the instrument. *Davis* vs. *Barr,* (9 S. & R., 141.) The condition prescribed by the act was both collateral to the bonds and inconsistent with their legal effect.

The provision in question having been intended for the benefit and protection of the county, it was competent for the commissioners to waive it, which they did, in point of fact, by executing and delivering to the company instruments obliging the county to pay to the holder or bearer thereof.

The bond of a corporation, payable to bearer, passes by delivery, and the holder may sue in his own name; or, in other words, the obligation of the contract is to pay the bearer.

These bonds were intended for the market, and were made negotiable by the contract of the parties. Although not negotiable in the mercantile sense of the term, yet the county, having agreed that they should pass from hand to hand by delivery and be payable to bearer, is estopped from denying to them the character and effect of regularly negotiable paper. *Ohio, ex rel. Moran Bros.* vs. *Com. of Clinton Co.,* (6 Ohio S. R., 285;) Legal Int., Dec. 10, 1858, per GRIER, J., in *M'Coy* vs. *Washington Co.*; *Lafever* vs. *Carr,* (3 Casey, 413;) *Morris Canal Co.*

vs. *Fisher*, (N. J. Rep.;) *Delafield* vs. *State of Illinois*, (2 Hill, 189;) *Stoney* vs. *Trust Co.*, (11 Paige, 365.)

In 1 Parsons on Contracts, 240, it is said: " We regard the English authorities as making all instruments negotiable which are payable to bearer, and which are also customably transferable by delivery, within which definition, we suppose, the common bonds of railroad companies will fall. Usage must have great influence in determining this question. The true test as to whether an instrument is negotiable or not should depend on whether any writing is necessary in order to its transfer."

The condition prescribed in the act was a rule to the company exclusively, and was only intended to apply to the bonds of the county that might be delivered directly to the company in payment of the subscription to its capital stock.

What notice, actual or constructive, had the plaintiff that the bonds in controversy were ever in the hands of the company? The county was authorized to subscribe to the stock, but not limited to any particular mode of payment. The commissioners might have sold the bonds of the county in the market, and paid for the stock with the proceeds; or they might have borrowed money and applied it to that purpose, with or without the issue of bonds. Besides, it is a part of the defendant's case that the county had no authority to issue bonds at all in payment of said subscription. The bonds themselves contain no ear-marks tending to show that they had passed through the hands of the company, nor is there any circumstance on the face of them to give notice of the default of the company.

Assuming that the plaintiff had notice of the condition in the act, and that these particular bonds had been in the hands of the company, how was he to ascertain whether or not they had been put in circulation by the company at less than their par value? If they were in fact sold in disregard of the condition, the obligor would not be likely to know of the fact, because it must necessarily have occurred after the delivery of the bond. The company would not be likely to publish its own wrongful act, or to give information such as would impede the circulation of the bonds or impair their value.

The provision in restraint of the use of the bonds is not a condition, but is in the nature of a collateral and independent covenant. The county, by the contract of subscription and the delivery to the company of its bonds, became a stockholder, and was entitled to participate in the management of the affairs of the company.

The contract, therefore, between the county and the company was not executory, but an executed contract. The holder of the bond would be entitled, according to its tenor, to look to the obligor for payment, and the county to resort to the company's statutory obligation for indemnity for any violation of the prohibition to sell the bonds at less than par. It is like the case of a grantee taking a covenant against a known incumbrance. In case of breach of the covenant, he cannot withhold the purchase money, but must resort for indemnity to an action on his covenant.

Mr. Justice WAYNE. This is an action of debt brought upon coupons for interest attached to bonds, which had been passed by the county of Lawrence to the Northwestern Railroad Company, in payment of its subscription for two hundred thousand dollars to the capital stock of that company.

It is here upon a certificate of a division of opinion between the judges of the Circuit Court.

The company was incorporated as the Northwestern Railroad Company on the 9th February, 1853, with the power to build a railroad from some point upon the Pennsylvania or the Alleghany Portage railroad, at or west of Johnstown, by the way of Butler, to the Pennsylvania and Ohio State line, at some point on the western boundary line of *Lawrence county,* It was to be done on the most eligible route, &c., &c., and to be connected with any railroad then constructed, or which might thereafter be built, at either end or at any intermediate point on the line thereof. The capital stock was to be twenty thousand shares, of fifty dollars each, with power to increase it to two millions of dollars, if the directors of the company should think its exigencies required that to be done. The company was authorized, in either event, in respect to the amount of

capital, to build the road *by borrowing money on its bonds, bearing interest at seven per centum,* not exceeding the amount of its capital, and with the further limitation, that no bond should be issued for less than one hundred dollars. The seventh and last section of the act is, that the counties, through parts of which the railroad may pass, are severally authorized to subscribe to the capital stock of the company, and to pay its subscription in such manner as might be agreed upon between the county and the company. But no county could subscribe more than ten per cent. upon its assessed valuation, and before any subscription could be made, its amount was to be determined by a grand jury of the county, and approved by it. And when that had been done and filed, the county commissioners were authorized to make the subscription as the grand jury had directed. Then follows a proviso, that when the bonds of the county were passed to the railroad company, they should not be sold by it at less than their par value. The meaning of that proviso will be given hereafter, when we shall consider the fourth question upon which the judges were divided in opinion.

Upon the trial of the case, the plaintiff gave in evidence the recommendation and direction of the grand jury for the subscription. It was executed by the commissioners to the amount of two hundred thousand dollars, for the payment of which the county was to issue bonds, with such conditions as might best promote the interests of the railroad company and of the county of Lawrence. The plaintiff also gave in evidence one of the coupons upon which he had sued, attached to the county bonds. We give a copy of it, that the obligation of the county to pay those coupons and their bonds, when the latter shall become payable, may be better understood:

COUNTY OF LAWRENCE.

Warrant No. 37 for 30 dollars. Being for six months' interest on bond No. —, payable on the first day of January, A. D. 1873, at the office of the Pennsylvania Railroad Company, in Philadelphia.

$30.                              —————— ——————, *Clerk.*

Here the plaintiff rested his case.

The defendant gave in evidence the agreement for the sub-

scription, as made by the commissioners. We have examined it in connection with the presentment of the grand jury, and found both properly in conformity with the section of the act giving to the counties, severally, the right to subscribe. It is recommended and determined, that the subscription of the county of Lawrence shall be two hundred thousand dollars, or four thousand shares of the capital stock of the railroad company, it being understood, that, whenever the amount of it should be required by the company from the county, it should be paid in bonds of sums not less than a thousand dollars, payable in twenty years after date, or at such other times after the date of the bonds as might be agreed upon between the commissioners of the county and the railroad company, the interest upon the bonds to be paid semi-annually by the *railroad company*, until the time when the road shall have been completed.

The defendant then gave other evidence, to prove that when the grand jury made its presentment, the railroad company had not been organized; also, that when the subscription was made, the company had not fixed upon its line, or that any part of it should be run within the limits of Lawrence county, and then that no part of it had ever been built within that county.

It was also proved by the defendant, that the company, in using the bonds of the county to get money upon them for the construction of the road, had sold them at a discount of twenty-five per cent., but not with having credited the county with less than their par amount.

Thus the case stood when it was submitted to the jury, and the defendant asked the court to give the following instructions:

1. That there was no authority vested in the county of Lawrence to make the subscription to the Northwestern Railroad Company, and that the subscription and the bonds which had been issued for its payment were void.

2. That the recommendation and report of the grand jury were materially deficient, in not setting forth or prescribing the terms and manner of payment, and that the subscription was void on that account.

3. That the county of Lawrence was not authorized to issue the instruments or bonds in question.

4. That the county bonds, which had been given in payment of the subscription, having been sold below their par value, was contrary to the provision of the act incorporating the railroad company, and were, therefore, avoided in the hands of purchasers.

We observe, in respect to the first, second, and third questions, that they are not now open questions in this court. They were in effect comprehended in the case of *Curtis* vs. *The County of Butler*, which this court passed upon at the last term, as well in respect to the constitutionality of the act of the 9th of February, 1853, as to what was the proper construction of it. This court then decided, after mature deliberation upon all the sections of the act, assisted by the arguments of Mr. Stanton and Mr. Black, which were in every particular fully up to the occasion, that, by the 7th section of the act of the 9th February, 1853, the counties through parts of which the Northwestern railroad may pass were authorized to subscribe to the capital stock of the company, and to make payments on such terms as might be agreed upon between the company and the county; and that the subscription was valid, and binding upon it, when made by a majority of its commissioners. It was also then decided, that the power given to the county to subscribe included its right to issue bonds, with coupons for interest attached, for the payment of its subscription. The constitutionality of the act was admitted in the argument then, as it has been in this case. But it is now urged, in addition to what was then said, that as the county of Lawrence had not been empowered *by name* to subscribe, such omissions must suggest a purpose of the Legislature, when passing the act, to accommodate itself to what is asserted to have been, at that time, the constitutional law of Pennsylvania, as it had been expounded by the Supreme Court of that State, in respect to the right of the Legislature to empower a county to subscribe and tax the people of it to pay for railroads and other improvements of a like kind, which were not positively to be constructed within its territory.

One of the cases cited is that of the *Commonwealth, ex relatione Dysart* vs. *McWilliams and Isett.* It was a *quo warranto,* in which it was alleged that they had usurped the office of supervisors and assessors of Franklin township, under and by virtue of the act of the 13th April, 1846, and of assessing, levying, and collecting taxes, for the use and benefit of the Spruce Creek and Water Street Turnpike Company. And it was decided that the defendants, as supervisors, had the power to levy and collect a tax to enable them to subscribe for shares of the stock of the turnpike company, at the cost of the inhabitants of the township, in virtue of the authority vested in the supervisors of townships by the act of the 15th of April, 1834, and because the 16th section of the act of 1846, incorporating the turnpike company, had provided that the supervisors of the public highways, in the townships through which the road may pass, "were authorized to subscribe in the name and behalf and for the use of its inhabitants any number of shares, not exceeding three thousand six hundred, in the capital stock of the turnpike road." The decision is not put upon the locality of the route of the road, though, in fact, it was located and passed through the township of Franklin; but upon the constitutional power of the Legislature to pass both acts just mentioned, and that, in doing so, it did not differ in principle from the power given to tax for the purpose of repairing roads and bridges, and for such other purposes as may be authorized by law.

Before leaving this case, we recommend it as a whole, and particularly the decision of Mr. Justice Bell, to the perusal of such of the profession who may be engaged in a case of *quo warranto* in the State of Pennsylvania.

The other case cited of *McDermond* vs. *Kennedy*, (Brightley's Reports, 332,) which was taken to the Supreme Court and affirmed, is, that a municipal corporation, under a power to make such by-laws as shall be necessary to "promote the peace, good order, benefit, and advantage of the borough," and to assess such taxes as may be necessary for carrying the same into effect, *is not authorized to levy a tax* for the payment of a part of the expense to be incurred by a railroad company in

bringing the line of their road nearer to the town than it had been originally located. Judge Reed places his conclusion, exclusively, upon. the disability of a borough corporation to exercise rights on private property, except for corporate purposes; and he says, it can no more raise a tax, and grant the avails of it to a railroad, because it is believed to be advantageous to the borough, than they could do anything else, for there is no relation or connection between the railroad and the borough. Neither of the cases cited have any application to sustain the position taken—that the Legislature meant, by omitting the names of the counties in the act of the 9th February, 1853, that it had not the power to authorize them. to subscribe to the capital stock of a railroad which was not to be run within its territory.

Nor do these cases countenance' the idea, that the power given to the county to subscribe was not exercisable *in presenti*, but was in abeyance until the passing of the railroad through it.. It is true, when a charter is given for franchises or property to a corporation, which is to be brought into existence by some future acts of the corporators, that such franchises or property are in abeyance until such acts shall have been done, and then they instantaneously attach. But not to distinguish the acts enjoined or permitted, to give to the corporation its intended purpose and object, is to confound the franchises with such acts, and would nullify the means by which the franchises are to be produced.

A franchise is a privilege conferred in the United States by the immediate or antecedent legislation of an act of incorporation, with conditions expressed, or necessarily inferential from its language, as to the manner of its exercise and for its enjoyment. To ascertain how it is to be brought into existence, the whole charter must be consulted and compared. If that depends upon co-operating subscriptions of 'money, to be borrowed upon securities of indebtedness bearing interest, payable yearly, or at times within the year, until the security is finally payable, it must be intended that all the parties, to whom has been given a right to subscribe, may use it to aid the beginning and the completion of the object; in other

words, when there is no express limitation as to the time of making the subscription, that it was optional with those who could do so to make it, when most convenient or advantageous to themselves. In this instance, we find that certain persons were named in the first section of the act as commissioners to receive subscriptions and to organize the company; and that the counties, through parts of which the railroad may pass, were permitted to make their subscriptions with those commissioners, and that they could receive them. Then, it was intended that the subscription should precede the organization; and no one, who reads the whole act, will doubt that the latter depended upon the subscription of the larger, if not the whole number of the twenty thousand shares of which the capital stock was to consist.

The road was to be built with money to be borrowed on the bonds of the company, and upon the bonds of such of the counties meant in the act which might choose to subscribe. Until the subscription received had indicated the responsibility of the parties to be equivalent to the contemplated cost of the road, or that it would become so, there was neither an inducement to organize the company, nor security for capitalists to lend upon.

We conclude that there is no weight in the suggestion, of its having been meant by the Legislature that the road was to be carried within a county before it could subscribe. The subscription depended upon the presentment of the grand jury, and the agreement of the commissioners to take for the county four thousand shares of the company's capital stock. And it was agreed that the subscription was to be paid for in bonds of the county of not less than a thousand dollars, payable in twenty years after date, or at such other time as the company and the county might agree upon. The company having agreed to pay the interest until such time as the Northwestern railroad should be completed, the county bonds were made and paid to the company accordingly; and we have no doubt of the obligation of the county to pay them.

But it is now said, that such of the county bonds as were sold by the president and directors of the railroad at a discount

are "avoidable" in the hands of the purchasers of them, because the act for making and paying them to the company declares that the company shall not sell them "at less than their par value." Such are the words of the statute; and it was proved and conceded by the plaintiff that they were sold at a discount of twenty-five per cent.

The words of the seventh section are, that whenever bonds of the respective counties are given in payment of subscriptions, the same shall not be sold by said railroad company at less than par value.

Those words have a meaning, but not such as it was assumed to be when the court was asked to instruct the jury upon the fourth prayer. A comparison of the seventh section, in which they are, with the fifth and sixth sections of the act, will show that they were meant to secure to the counties the par value of their instalments, as those were to be paid in bonds, from any reduction by the sale of them at a discount, to the loss of the county, after the railroad company had received them in payment. The words are, whenever bonds of the respective counties are given in payment, the same shall not be sold by the railroad company at less than par value, &c.; and such bonds shall not be subject to taxation until the clear profits of the railroad shall amount to six per cent. upon the cost of it. Such was the understanding of the commissioners and the railroad company when they entered into their agreement for the subscription. The agreement itself, the stipulation that the subscription was to be paid by bonds, the undertaking of the company that it would relieve the county from the payment of interest of its bonds, and that the interest should be on their par value until the entire railroad was completed—and every section of the act shows it to have been the intention of the Legislature to have the railroad constructed by money to be borrowed upon bonds, payable at a distant date—indicate the correctness of our interpretation of the limitation upon the sale of the county bonds at less than par. And the conclusion is strengthened by consulting the sixth section of the act, giving to the company the right to pay an interest of six

per cent. per annum to the stockholders, on instalments for subscription paid by them, until the railroad should be finished; and requiring, when that happened, that all interest which had been paid in the meantime should be credited to the cost of the construction of the road—in that, placing all of the stockholders upon an equality as to the cost of the road, and securing to them the number of shares for which they had subscribed, and for which they had paid by instalments. Without such an arrangement, that equality could not have been produced, and this result in respect to the subscription of the counties paid by bonds would have followed. If the railroad could have sold the bonds at less than par, after they had been received in payment, and charged the discount to the counties, in that case the latter could not have received the number of shares for which they had subscribed, by permitting a part of the sum, for which they were authorized to tax the counties, for the ultimate payment of the bonds, to be diverted to a purpose neither contemplated nor allowed by the act; and, in respect to the county of Lawrence, its subscription would have been reduced to fifty thousand dollars less than the amount of the bonds which it had issued and paid to the railroad, supposing the whole to have been sold at 25 per cent. less than their par value, in that way reducing its dividend—three thousand dollars per annum—when the clear income of the company, after it had been finished, should become 6 per cent. per annum upon the cost of the road.

We are confirmed in the opinion, that the limitation upon the company that it should not sell the bonds of the counties at less than par, after it had taken them in payment of the subscription, had no other meaning than this, that they should not so sell them at the expense of the counties—causing any loss to them less than their par value, as they were payable to the company at par in twenty years, with an annual interest of six per cent.

It has also been insisted, that the county of Lawrence could not subscribe before the Northwestern Railroad Company had been organized, or before its line had been indicated by a sur-

vey on the ground and a part of it had been fixed for construction within the county; and it is said that no part of it had been built in it.

Having already shown that the right to subscribe was given to enable the company to organize, and that organization was essential before the route of the road could be determined, and that there was no direction in the act when that was to be done, and that a wide discretion had been given as to the point of its beginning, and how it should be continued in the counties, and where it should terminate on the Pennsylvania and Ohio State line, we must declare that the objection has neither pertinency nor force against the subscription made by the county of Lawrence. Another objection is, that the right to subscribe depended upon a part of the road having been built within the county.

We deem it only necessary to repeat what has just been said, that the act indicates no point at which the line of the road should be begun. That, taken in connection with the fourth section of the act, it could not have been the intention to require a part of the railroad to be built in each county before it should subscribe; its language being, that its franchises should be used and enjoyed when five miles of the railroad had been finished, as fully as if the whole road had been completed.

We therefore answer, that there was authority in the county of Lawrence constitutionally, and by the proper construction of the act of the 9th February, 1853, to subscribe to the stock of the Northwestern Railroad Company as the subscription was made; and that the bonds issued by the county, and given in payment of its subscription to the railroad company, are valid, and binding upon the county to pay and redeem them according to their tenor.

We answer to the second prayer, that there was no deficiency in the action of the grand jury in making its presentment, or in setting forth the terms in which the subscription should be made.

We answer to the third prayer, that the county of Lawrence was authorized to issue such bonds as they did issue, and pass

to the railroad company in payment of its subscription to the Northwestern Railroad Company.

To the fourth prayer, we answer, that the sale of the county bonds, by the railroad company, at less than par, does not avoid them in the hands of the purchaser.