The Commissioners of Roads, etc., *vs.* Shorter.

THE COMMISSIONERS OF ROADS AND REVENUE FOR FLOYD COUNTY, plaintiffs in error, *vs.* ALFRED SHORTER, defendant in error.

1. In 1857 the Legislature passed an Act making the county of Floyd a corporation, and declared that it should be represented in its corporate capacity by the Inferior Court of said county. The Act further provided that, on the first Monday in February, 1858, or at any time thereafter which shall be determined, ordered and published by the Inferior Court, the people of the county should vote on the question of subscription or no subscription, and that the returns of the election should be made to the Justices of the Inferior Court, who shall consolidate the same and enter the result upon the minutes of the Court. The Act further provided that if a majority of the votes should be for subscription, the Inferior Court should subscribe not less than fifty nor more than one hundred thousand dollars of stock in the Georgia and Alabama Railroad, and issue bonds of the county of Floyd therefor to said company in payment of stock, payable not exceeding ten years from date, bearing seven per cent. interest, payable semi-annually at such place as the said Inferior Court may determine. In October, 1859, the Inferior Court passed an order reciting that it deemed it for the interest of. the county that said road should be built, and ordering the election, as provided. Due notice was given; the election had, the returns made, consolidated, and the result entered on the minutes. Thereupon, without any further entry on the minutes, a majority of the Justices agreed among themselves to subscribe, proceeded to the company's office and did subscribe for $75,000 00 of stock, and issued bonds as called for to the amount of $25,000 00. Each Justice signed the subscription in the absence of the others, and also signed his name to the bonds in the absence of the others. The bonds were made payable to Alfred Shorter, President of the Georgia and Alabama Railroad Company, or order, and having been by him indorsed, were in the hands of the plaintiff as holder:

*Held,* That when the election was duly had, and the result entered on the minutes, the authority of the Inferior Court to make the subscription and issue the bonds was complete, without any further entry or order of the Court that it would make the subscription.

2. By the words "Inferior Court" in the Act, the Legislature meant the "Justices of the Inferior Court," or "the Inferior Court for county purposes," and not the Inferior Court proper sitting twice a year as a Court of law under the existing Constitution of the State.

3. However proper for public information and for the regularity of business it would have been that the minutes of the Inferior Courts should show that the subscription was made and the bonds issued, with full details of the whole transaction, yet, when the result of the election

was put upon the minutes, as the Act required, the authority of the Court to make the subscription and issue the bonds was complete, and under the uniform practice of the "Justices of the Inferior Court" in this State, in making contracts within the scope of their authority, it was competent for the Justices to make said subscription and sign and issue said bonds when they were not regularly in session as a Court. And it appearing that a majority of the Justices did, in fact, sign said subscription, officially, and sign and issue the said bonds as "Justices of the Inferior Court" of Floyd county, the bonds are binding upon the county, especially in the hands of third persons, *bona fide* holders thereof.

4. The indorsement on the bonds by "Alfred Shorter, President Georgia and Alabama Railroad Company," passed the title in the bonds to the holder. The bonds being issued for purposes of negotiation, this was a sufficient indorsement to put them in circulation, notwithstanding the charter of the railroad company required a different mode of making and signing ordinary contracts to bind the company.

County matters. Inferior Court. Corporations. Railroads. Indorsement. Before Judge McCUTCHEN. Floyd Superior Court. July Adjourned Term, 1872.

Alfred Shorter petitioned the Judge of the Superior Court of the county of Floyd for the writ of *mandamus*, to be directed to the Commissioners of Roads and Revenue for said county, alleging as follows:

He represents to the Court that he is the owner, in his own right, of five bonds of the county of Floyd, issued on the 10th day of September, 1860, numbered from eleven to fifteen, inclusive, each for the sum of $1,000 00, due on the 1st of July, 1870, commonly called coupon bonds; and, as executor of Elizabeth Cooley, he holds one other bond of said county for the same amount, numbered twenty-three, issued on December 31, 1860, and due January 1, 1871. Each of the said six bonds is as follows, except as to dates and number:

"$1,000 00. No. ...... ROME, GEORGIA, ......, 1860.

"On the ...,... day of ......... 187..., the county of Floyd promises to pay to Alfred Shorter, President Georgia and Alabama Railroad Company, or order, at the Importers' and

Traders' Bank, New York City, the sum of one thousand dollars, with seven per cent. interest thereon, from this date, payable at the same place, on the first day of January next, and semi-annually thereafter, on surrender of the annexed corresponding coupons.

"And it it is hereby contracted with the holder of this bond that ten shares, of one hundred dollars each, of the stock of the county of Floyd in the Georgia and Alabama Railroad Company shall stand pledged as collateral security for the payment of this bond. And it is hereby stipulated that no transfer will be made of said stock without the consent of the bondholders, or the redemption of an amount of the bonds thus secured equal to the amount of stock thus transferred.

"Done by virtue of an Act of the General Assembly of the State of Georgia, passed December 22, 1857.

" JOHN R. TOWERS, J. I. C.,

" CHARLES H. SMITH, J. I. C.,

" SAMUEL MOBLEY, J. I. C."

The bond of the Cooley estate is payable at the " Branch Bank of the State of Georgia at Augusta, Georgia."

Each of the bonds has written on the back of it the words, " Alfred Shorter, President of the Georgia and Alabama Railroad Company."

Attached to them, when issued, were twenty coupons, numbered from one to twenty, consecutively, and falling due successively on each 1st of January and 1st of July during the ten years to the maturity of the bond. Each coupon is as follows, except as to number and time when due:

"$35 00.                                    No. .........

"Warrant for thirty-five dollars due by the county of Floyd on the 1st day of .............., 18..., for six months' interest on bond No. .......

" JOHN R. TOWERS, J. I. C.,

" CHARLES H. SMITH, J. I. C.,

" SAMUEL MOBLEY, J. I. C."

The Commissioners of Roads, etc., *vs.* Shorter.

The petition states that the first five coupons of each of the bonds of Shorter, and the first four of the bond of the Cooley estate, have been paid. The balance are unpaid.

Said bonds and coupons have come to the holder in usual course of trade, and for a valuable consideration. They were issued in payment of a subscription by the county of Floyd to the stock of the Georgia and Alabama Railroad Company. The issue of said bonds was authorized by an Act of the General Assembly, which is as follows:

"*An Act to authorize the county of Floyd to aid in constructing the Georgia and Alabama Railroad, by the subscription for stock and the issue of bonds therefor, upon a vote of the citizens of said county.*

"SECTION I. *Be it enacted,* That the county of Floyd shall be a corporation, with all the necessary powers, for the purposes of this Act, and shall be represented in its corporate capacity by the Inferior Court of said county.

"SEC. II. *Be it further enacted,* That on the first Monday in February, 1858, or at any time thereafter which shall be determined, ordered and published by the Inferior Court, giving at least thirty days' notice thereof, the legal voters of Floyd county shall assemble at the Court-house and the election precincts in said county, and vote "county subscription," or "no county subscription." The election shall be held and conducted in the same manner as elections are required to be held for county officers, and the returns shall be made to the Justices of the Inferior Court, who shall consolidate the returns and enter the result upon the minutes of Court, and if a majority of the votes so cast shall have been for "county subscription," then the Inferior Court shall subscribe not less than $50,000 00 nor more than $100,000 00 to the capital stock of the Georgia and Alabama Railroad Company, and shall issue bonds of Floyd county therefor to said railroad company in payment for said stock, at par value, in amounts not exceeding $1,000 00 each, payable not ex-

ceeding ten years from date, bearing interest at seven per cent. per annum, and said interest payable semi-annually, at such place or places as the said Inferior Court shall determine.

"SEC. III. *Be it further enacted,* That the capital stock so subscribed by the county of Floyd, and the resources arising from the county tax shall be pledged for the redemption of the said bonds, and said stock shall not be used for any other purpose, and all dividends arising from said stock shall be appropriated to the payment of said bonds.

SEC. IV. *Be it further enacted,* That the Inferior Court of Floyd county shall assess and collect a county tax of such per cent. upon the State tax as shall be sufficient to pay the interest semi-annually due, and to protect the credit of the county, and should it be necessary, after applying the stock so subscribed to the redemption of the bonds, to raise any amount for a balance due, the said Court may order and assess such tax as may be necessary to fully redeem said bonds and the unpaid interest due thereon.

"Assented to December 22d, 1857."

The petition then states that an election was held in pursuance of said Act, and resulted in favor of the subscription, and that the Inferior Court did make the subscription on the ...................., and afterwards issued the bonds aforesaid, and others in part payment thereof.

The interest due has been demanded "of the county of Floyd," and payment refused, and the Commissioners of Roads and Revenue refuse to levy a tax to pay the said coupons due and to become due. He, therefore, prays for *mandamus,* etc.

*Mandamus nisi* granted at Chambers, December 15, 1869, by F. A. Kirby, Judge, etc.

The Commissioners of Roads and Revenue answered as follows:

1st. That all the coupons which had matured more than twelve months before their presentation for payment, were barred by limitation.

2d. That the records and minutes of the Inferior Court nowhere show that said Court ever authorized or directed any subscription to the stock of the Georgia and Alabama Railroad Company; nor do they anywhere show that said Court ever authorized or directed the issue of bonds in payment for such stock.

3d. Respondents are informed, and believe it to be true, that the bonds and coupons referred to in the petition were signed by those whose names appear thereto, at different times and places, and when no three of them were together, and at times and places when the Inferior Court was not in session.

4th. The minutes and records of the Inferior Court do not show that any person was ever authorized to subscribe for stock, or to sign bonds or coupons for the purposes designated, nor that the Court itself ever did either of these things.

5th. Respondents are advised that the issue of said bonds and coupons was illegal, and that the county is not liable to pay the same.

Issue having been joined on the answer, evidence was introduced by the relator as follows:

First, the six bonds, with the coupons attached, as heretofore copied and set forth in the petition. Next, the following certified abstract from the minutes of the Inferior Court:

"OCTOBER 19, 1859.

"*Inferior Court of Floyd county, in session for a special county purpose.*

"Ordered by the Court that we deem it for the interest of the county of Floyd that a railroad be built from the city of Rome in the direction of Dalton and Gadsden, under the charter organizing the Georgia and Alabama Railroad Company. We, therefore, in compliance with and by authority of the Act of December, 1857, do hereby order and determine that an election shall be held at the Court-house and election precincts in the county, on the 22d day of November next, and the vote to be taken by ballot, 'county subscription' or 'no county subscription,' and that notice of said election be

advertised in the Southerner, in compliance with and according to said Act.

> " Charles H. Smith, j. i. c.,
> " J. R. Towers, j. i. c.,
> " Samuel Mobley, j. i. c."

" GEORGIA—Floyd County:

" We, the undersigned, do certify that we have consolidated the returns as made to us by the managers of an election held on the 22d day of November, 1859, by virtue of an Act of the Legislature, passed the 22d December, 1857, to determine by vote whether or not the Inferior Court of said county should subscribe for stock in the Georgia and Alabama Railroad, and we have counted, compared and added together the votes polled. Upon a consolidation, we find that there was polled for 'county subscription,' (735) seven hundred and thirty-five votes; and 'against county subscription,' (321) three hundred and twenty-one votes. The whole vote polled was one thousand and fifty-six: 'county subscription,' seven hundred and thirty-five; 'no county subscription,' three hundred and twenty-one; majority for 'county subscription,' four hundred and fourteen.

" Given under our hands and seals, this November 23, 1859.

> " Charles H. Smith, j. i. c.,
> " L. D. Burwell, j. i. c.,
> " Samuel Mobley, j. i. c.,
> " J. R. Towers, j. i. c."

" Floyd County—To Southerner and Advertiser office:

" To advertising call by Inferior Court for an election to determine whether county shall indorse bonds of Georgia and Alabama Railroad Company, $5 00.

" Ordered that the within account be paid out of any money that may be in the treasury.

> " J. R. Towers, j. i. c.,
> " William McCullouch, j. i. c.,
> " Lewis D. Burwell, j. i. c."

"ROME, GEORGIA.

"At the regular meeting of the Court, it was agreed that Judge T. McGuire has been chosen by the Court to represent the county stock, as a director, in the Rome and Alabama Railroad Company, and we instruct our director to cast the vote of the Court for such men as directors as shall be agreed to by a majority of the Court.

"WILLIAM McCULLOUCH, J. I. C.,
"THOMAS J. DAVIS, J. I. C.,
"W. T. NEWMAN, J. I. C.

"May 13th, 1861."

"TUESDAY, February, 1867.

"Honorable Inferior Court for county purposes met pursuant to adjournment. Present, their Honors C. K. Ayer, J. King, J. E. Veal and D. M. Hood, Justices presiding.

"Ordered by the Court, that D. M. Hood be authorized by the Court to inquire into the indebtedness of the county to the Georgia and Alabama Railroad, whether the Selma, Rome and Dalton Railroad Company assumes the payment of said indebtedness and relieves the county from the payment of the same, and that he associate with him Daniel S. Printup and Charles H. Smith."

"FLOYD COUNTY, to Wright & Broyles,    Dr.    1866.

"To investigating and giving opinion at the request of the Justices of the Inferior Court, as to the liabilities of the said county on certain railroad bonds, heretofore issued by said Court on subscriptions made to the Dalton and Alabama Railroad, $50 00.

"Ordered by the Court that the county treasurer pay Wright & Broyles $50 00 out of general funds.

"D. M. HOOD, J. I. C.,
"JOHN M. GREGORY, J. I. C.,
"JOSEPH E. VEAL, J. I. C.

"December 2d, 1867."

C. H. SMITH, sworn, said: As one of the Justices of the Inferior Court, I was present at the meeting of Justices on the day the vote was consolidated, and participated in it. There was an agreement among the Justices then present that we would take stock in the Georgia and Alabama Railroad for $75,000 00, this being an amount intermediate the extremes mentioned in the Act of December, 1857. The Justices were to go in person and each one sign his own name as the representative of the county to the subscription of stock. They did not go at that time, nor did they ever go in a body to subscribe for the stock. The subscription book was at my office, I being the secretary and treasurer of the railroad company. I signed for myself, and I am certain that a majority of the Justices signed also, but I do not remember which of the other Justices signed. Their signatures were all made at different times, and separately. At the time of meeting to consolidate the votes, it was also decided that I should have the bonds prepared, which I did, and then the Justices of the Inferior Court, whose names are to the bonds and conpons, signed them separately, and at different times, when no two of them were present. I was at the same time a subscriber in my own name to the stock of the railroad to the amount of $3,000 00. Samuel Mobley was a subscriber also to the amount of $500, and, I think, L. D. Burwell also had subscribed for some stock. The subscription made by the Justices of the Inferior Court was accepted by the board of directors of the Georgia and Alabama Railroad Company in November, 1859. The first call for payment of stock by subscribers was made in November, 1859, for five per cent. of subscriptions. The second call was for ten per cent. in April, 1860. The third call was for ten per cent. in July, 1860, and the fourth and last call was for ten per cent. in October, 1860. About two-thirds of the grading between Rome and the Alabama line was done, and a bridge built across the Etowah river at Rome, when the war began and work was then suspended on the road. Only twenty-five bonds for $1,000 00 each, with coupons attached were issued; and when issued, which was in

September and December, 1860, as their dates will show, I delivered them to Colonel Alfred Shorter, who was the president of the railroad. No stock, nor certificate of stock, was ever issued to the county. My term, as Justice of the Inferior Court, continued till the next election, which was, I think, in January, 1861. We had not provided a fund to pay these coupons. After the war, there was an agreement made between the stockholders and directors of three different Railroad companies, to-wit: The Dalton and Jacksonville, the Georgia and Alabama, and the Alabama and Tennessee Rivers Railroad Companies, to consolidate, which consolidation was effected by authority of enabling Acts of the Legislatures of Georgia and Alabama, constituting what is now known as the Selma, Rome and Dalton Railroad Company. The bonds issued and delivered to Shorter were delivered to him in payment of the county subscription.

Respondents objected to that part of C. H. Smith's testimony in which he speaks of the action of the Justices of the Inferior Court, or their agreement to do anything, or their direction about doing anything in reference to the subscription of stock or preparing the bonds.

The Court overruled the objection, and respondents excepted.

Respondents proposed to prove by him that there were at least two thousand voters in Floyd county at the time of the election upon this question of subscription or no subscription, and how many votes were polled.

The Court refused to permit this proof to be made, and respondents excepted.

SAMUEL MOBLEY, sworn, said : I was one of the Justices of the Inferior Court, and was present at the meeting of the Justices to consolidate the vote, and think we agreed to subscribe for stock in the railroad. I did not sign the subscription of stock for the county, but was a stockholder myself in the road to the amount of five shares. The road had been laid out and graded through my land, and damages for the

right of way were assessed in my favor to the amount of $500 00 against the road, and this amount I agreed to take in stock, but none was ever issued to me. I signed the bonds and coupons which have my name to them, at my house, about three miles from Rome, none of the other Justices being present, and returned them to Mr. C. H. Smith, who had previously signed some or all of them. I returned them to him, as he had given them to me for that purpose. I supposed he knew what to do with them, and that they would be put on the market. They were at my house some four or five days, during which time I signed them.

The same objection was made to Mr. Mobley's testimony that was made to Mr. Smith's, and overruled by the Court, and respondents excepted.

ALFRED SHORTER, sworn, said: A few days after these bonds were issued and delivered to me, as president of the Georgia and Alabama Railroad Company, in payment of the county subscription, I advanced the amount of five of them to the road and took the bonds myself; others were delivered to Mr. Gray, the contractor, in payment for work upon the road, and he sold one of them to Mrs. Cooley, who was then living, but now dead, and upon whose estate I am the executor; the other nine, which he received, he sold to the Bank of the Empire State, of which I was president; these, among the other assets of the bank, were turned over to H. D. Cothran, as assignee of the bank after the war, and were by him sold at public outcry, at the Court-house in Rome, about the year 186..., and I bought them at $300 00 or $400 00 each, intending to use them in payment of the liabilities of the bank, which had failed—or, at least, I intended to let the bank have the use of them in settling its liabilities. Besides being president of the bank, I was also a stockholder, and so was Colonel Cothran. At the time I received the bonds, I knew of no informality in the action of the Court in reference to their issue; made no inquiry upon the subject. Knew of

no money belonging to the county in the Bank of the Republic.

(Here a paper was shown to Mr. Shorter, of which he stated he had served a copy upon Jesse Lamberth, the Ordinary of Floyd county.)

It was introduced, and is a paper presented to the Ordinary on May 31, 1869, containing a statement of the bonds and coupons held by the petitioner, and a demand that the Ordinary levy a tax and pay the coupons then due, and to fall due July 1, 1869.

A paper was next offered in evidence, and objected to by counsel for respondents, but admitted by the Court, a copy of which is as follows:

"Ordered by the Court, that D. M. Hood, Wade S. Cothran and Daniel S. Printup are authorized to represent the county of Floyd in the convention of the Selma, Rome and Dalton Railroad Company, to assemble in Selma on the 15th of May, 1867. Either of said persons mentioned can use this authority, or conjointly.

"D. M. HOOD, J. I. C.,
"J. KING, J. I. C.,
"J. E. VEAL, J. I. C.

"May 10th, 1867."

"GEORGIA—FLOYD COUNTY:

"I, James W. Langston, Clerk of the Inferior Court of Floyd county, do hereby certify that the above and foregoing is a true extract from the minutes of said Court.

"Given under my hand and seal of said Court, this the 14th day of May, 1867.

[L. S.]            "JAMES W. LANGSTON, Clerk."

To the admission of this document the respondents excepted.

D. M. HOOD, sworn, said: The resolution or order just introduced in evidence was adopted by the Inferior Court at the time it bears date, upon the idea that the Inferior Court of

The Commissioners of Roads, etc., *vs.* Shorter.

the county had really subscribed for stock in the Georgia and Alabama Railroad Company, in conformity to the law, and that the county was really a stockholder in the road; never knew of these difficulties about the manner of subscription until after that order or resolution was adopted. During my term of office (which was about three years,) as a Justice of the Inferior Court, we had no funds in any bank to pay these coupons.

SAMUEL MOBLEY, re-introduced, said: While I was in office as Justice of the Inferior Court, we had provided no funds in any bank to pay these coupons.

D. S. PRINTUP, sworn, said: I was present at a convention of the railroad stockholders in 1866, at the time it was agreed to consolidate the three railroad companies, and was afterwards elected vice-president of the Selma, Rome and Dalton Railroad Company. As such vice-president, I offered to turn over to Jesse Lamberth a certificate of stock in the Selma, Rome and Dalton Railroad, issued in favor of the county for the stock subscribed in the Georgia and Alabama Railroad. Mr. Lamberth refused to accept it. This was before this action was begun, and was in 1869 or 1870. Dr. J. M. Gregory was present at that convention and took part in the meeting— and he was then one of the Justices of the Inferior Court of Floyd county, and claimed to be representing the county.

JESSE LAMBERTH, sworn, said: I was Ordinary of Floyd county from 1852 till the election and qualification of my successor, H. J. Johnson, in 1869. I acted as his clerk during that year, and did most of the business of the office. The certificate of stock as testified to by Col. Printup, was offered to me and refused. During my term of office I had provided no funds with which to pay these coupons.

Relator closed. Respondent introduced no testimony.

The charge of the Court to the jury was substantially as follows:

The Court read to the jury the Act of December, 1857, authorizing the issue of bonds, etc., by the county of Floyd, and charged, that if the bonds were issued without authority, then they and the coupons are void, even in the hands of a *bona fide* holder, and the plaintiff cannot recover.

1st. But if you find from the evidence that the Inferior Court did order an election, and give notice as required by the statute, and a majority of the votes polled at that election were for county subscription, and if the result of that election was placed upon the minutes of the Inferior Court as required by the Act, then, in the opinion of the Court, the statute under which the election was held, and the vote of the legal voters of the county, constituted a legal authority for the subscription of stock, and also for the issuing of bonds by the Inferior Court. If you find from the evidence that these facts existed, which the Court has charged you constituted the authority for the subscription to be made and the bonds to be issued; and if you further find from the evidence that the Justices of the Inferior Court, or a majority of them, actually agreed among themselves when together, to make the subscription and issue the bonds, and that they actually made the subscription for the stock and signed the bonds and delivered them in payment thereof, then the fact that the Justices may have signed the subscription, and may have signed the bonds while they were not in the presence of each other, cannot vitiate the bonds in the hands of a *bona fide* holder, without notice of those facts.

The Court here explained what constitutes a *bona fide* holder without notice, and proceeded as follows:

2d. These bonds are negotiable, commercial securities, issued by a corporation, and like ordinary promissory notes in this respect. And if it appears from the bonds that they were issued under the Act of December, 1857, which is the charter of the corporation; and if it appears from the evidence that the plaintiff purchased them *bona fide,* and without notice of any irregularity in their issue, and for a valuable consideration, paid by them to the railroad company, then

the bonds are valid in his hands and binding on the county, though there may have been irregularities in their issue, and though no resolution was entered on the minutes of the Inferior Court directing the subscription to be made or the bonds to be issued, and though the bonds were not signed when the Court was in session, or at their usual place of meeting; *provided*, the subscription for stock and the bonds were actually signed by three or more of said Justices, and the bonds delivered, as I have before explained.

3d. If the plaintiff was such a *bona fide* purchaser of the bonds before they fell due, his rights would not be affected by *fraud*, provided he took the bonds without any notice of the facts constituting the fraud. But it is not necessary that I charge as to fraud, as the question is not made in the pleadings in this case.

4th. The Inferior Court was the sole judge of the question whether a majority of the legal voters of the county had voted in favor of subscription; and if they have determined that question in the affirmative, it cannot be a question on this trial. Whether there were more voters in the county than voted is immaterial, as a majority of those voting decided the question.

5th. The jury have the right to take into their consideration the recitals in the bonds, in connection with all the other testimony in making up their finding.

6th. If the bonds were executed at the time they bear date, then, in the opinion of the Court, the plaintiff would not be barred by the statute of limitations.

The jury returned a verdict in favor of the relator.

The respondents assign error upon each of the aforesaid grounds of exception, and upon each portion of the charge of the Court numbered, respectively, 1, 2, 3, 4, 5, 6.

WRIGHT & FEATHERSTON; ALEXANDER & WRIGHT, for plaintiffs in error.

1st. Exercise of power by corporate or *quasi* corporate bodies must be at a corporate meeting: Dillon on Mun. Cor.,

secs. 197, 208; 19 N. J. Eq., 412; 25 Md., 18; see 3 Ga., 331. Power conferred on a council can be exercised only by ordinance: 18 Md., 284, 300; *Ibid.*, 276; 16 Cal., 225; 20 Cal., 96; Cooley's Cons. Lim., sec. 204. Contracts made by majority of board of aldermen, void: 7 Gray, 12; 13 Gray, 347; 6 Cal., 531; see 20 Ga., 363.

2d. Requisites of a valid session of the corporate body: Dillon on Mun. Corp., secs. 200, 202, 223, 224; 22 N. Y., 128; 2 Gill., 254; 7 Conn., 214; 2 House of Lords' Cases, 789.

3d. No valid action of the individuals shown: 2 Pick., 345; 1 Bos. & Pul., 229; 2 *Ibid.*, 31; 6 Johns., 39; 6 S. & R., 166; Story on Agency, sec. 42; 7 Cow., 526; 21 Wend., 178; 31 Miss., 525; 26 Conn., 192; 22 Barb., 400; *Ibid.*, 137; 5 Bin., 481.

4th. What constitutes ratification by corporate bodies: 10 Wal., 676; 5 Cal., 531.

5th. There can be no innocent purchasers of void bonds: 7 Wal., 666; 10 Wal., 676.

UNDERWOOD & ROWELL; SMITH & BRANHAM, for defendant.

1st. There was no fraud in the issue or the purchase of the bonds. Fraud is not a question in the case. The bonds are negotiable securities. Bonds, payable to bearer, or indorsed in blank when payable to order, pass by delivery. Form of the bond show this: 20 Howard, 343, 364.

2d. Mobley says they were delivered to be put on the market. Shorter and Cooley are *bona fide* holders for value: 2 Ga., 92, (6,) 103, (6.)

3d. The bonds were issued to Shorter, president, for negotiation. His indorsement passed the title, (1 Kelly, 418;) but the title is not questioned: Statute of Limitation, 43 Ga., 258; Commissioners Limestone Company *vs.* Rather *et al.*, at the last term of the Supreme Court of Alabama; 9 Wal., 478; 3 *Ibid.*, 327; Irwin's Code, 2865. Act of 1869 not barred if sued by January, 1870: 14 Wal., 282, (5.)

The Commissioners of Roads, etc., *vs.* Shorter.

4th. Case in 46 Georgia, 462, refers only to contracts made since the adoption of the Code.   All that was required to be entered on the minutes by the Act was so entered, to-wit: the election.   The books of the railroad company were the proper place to make the subscription.   The duties of the Court were ministerial, not judicial: 9 Ga., 485; 1 Kelly, 579; 6 Ga., 145, (3,) and 157, (5;) 19 *Ibid.*, 487; 20 *Ibid.*, 334; 3 Wal., 96; 1 Sneed, 680; Angell & Ames on Corporations, 291.

5th. The contract was the act of the county and bound the county; (2 Kelly, 216;) initials "J. I. C."   All judicial acts subject to review by appeal or *certiorari;* ministerial are not. Courts can only be held at stated times.   *Mandamus* the remedy: 5 Ga., 522; 18 *Ibid.*, 473.

6th. If the Inferior Court had the power, under the statute, to act, then the bonds are valid, especially in the hands of *bona fide* holders, though there were irregularities in their issue: 21 Howard, 539; 24 *Ibid.*, 288, 375; 1 Wal., 83 to 93, 175, 385; 9 *Ibid.*, 414; 13 *Ibid.*, 305; 14 *Ibid.*, 282; 15 *Ibid.*, 355; 5 *Ibid.*, 784; 11 *Ibid.*, 476; 1 Sneed, 637; Irwin's Code, 2743; 43 Conn. Reps., 400; 8 Volume American Law Register, 274; 33 Mississippi, 440.

7th. On power of a majority to act: 9 Pick., 146; 35 New Hampshire, 477; 26 Connecticut, 192; 21 Wend., 187; 9 Ga., 367; 1 Kelly, 271; Code, of 1873, section 4.

8th. On ratification: 6 Ga., 171; 10 *Ibid.*, 362; 20 Cal.; Code, section 2142.

9th. On proof of agreement by Justices to subscribe and issue bonds: 1 Greenleaf on Evidence, 513; 3 B. & C., 449, 451; 20 Ga., 334, compare with 364; 13 *Ibid.*, 485.

McCAY, Judge.

1. Whilst we sympathize deeply with the citizens of a community who, misled by high hopes of profit from a scheme of internal improvement, have borrowed money to inaugurate it, and after the scheme has failed, are pressed to pay the debt they have contracted, we still feel that the men who have honestly bought their bonds have, themselves, equities of a

high character. The *authority* to make the subscription and issue the bonds was complete when the vote was consolidated and entered on the minutes. All that the Act required to be done was then done. Indeed, by its terms, no discretion was left to the Inferior Court. If the people should vote for subscription, the Court is directed to subscribe. It needed no resolution or order of the Court to determine whether there should be a subscription. So that it can, we think, be said, without qualification, that the "Inferior Court" had the power and legal authority to issue the bonds authorized by the Act as soon as the people had voted in favor of subscription and their action been spread upon the minutes.

2. An examination of the innumerable Acts passed by the Legislature during the existence of the "Inferior Court," will show that it was designated sometimes as the Inferior Court, and sometimes as the "Justices of the Inferior Court." When any legislation was had in relation to its powers as a Court of law, it is true, it was uniformly designated as "the Inferior Court;" but in legislation in reference to its power over roads, bridges, taxes, and the general management of county affairs, both designations are given it. Often, in the very same Act, powers are conferred and duties cast, in one sentence, on "the Inferior Court," and in another on "the Justices of the Inferior Court;" and this, too, in relation to matters which, in the nature of them, could not be attended to at the regular sessions held twice a year for the exercise of its constitutional jurisdiction as a Court of law.

The Code adopted by the Legislature in 1860, in stating the duties of the "Inferior Court," after pointing out its duties as a Court of law, goes on, in the same section, to add its duties over the county property, its duty to lay taxes, establish bridges and roads, ordering elections to fill vacancies, settling claims against the county, providing for the support of the poor, etc., all of which are duties which it has been the universal custom and practice for the Inferior Court to perform when it was not sitting at its semi-annual sessions as a Court of law. It is very evident, too, from an inspection of

the Act under which these bonds issued, that the words "Inferior Court," used by the Legislature, in this Act, must mean the Inferior Court at its called meetings for the transaction of its ordinary county business. The duty cast upon the Court is just such duty as it performs at such meetings. The Act itself uses both the modes of designating the Court. After providing that the Inferior Court shall represent the county, it provides that the Justices of the Inferior Court shall consolidate the returns and enter the result on the minutes of Court. Here the Justices are directed to have this result entered on the minutes *of Court.* What Court? Evidently, the minutes kept of the transactions of the Justices of the Inferior Court, whether at their semi-annual meetings as a law Court, or at their called meetings for the transaction of county business of any kind; for it must be remembered that the same book of minutes has always been used to record the action of the "Inferior Court" sitting as a Court of law, and the Inferior Court sitting for county purposes. For these reasons, we are of the opinion that the "Inferior Court," as used in this Act, does not mean "the Inferior Court" sitting as a Court of law, at its semi-annual sessions, but the Inferior Court in its every-day, ordinary sense, to-wit: that body which governed the county, laid out its roads, assessed its taxes, etc., and which met, at its pleasure, for the transaction of any business it had to do. If it be true, then, that the Inferior Court had power to issue these bonds, and it be further true that the "Inferior Court" did issue them, it would seem, from the current of authorities, that, as against a *bona fide* holder, it is immaterial whether there were, or were not, irregularities in the issue.

One can hardly conceive but that it was the clear intent of the Legislature that the bonds it intended to authorize were to be signed by the Justices of the Inferior Court, or a majority of them. That has always been the mode in which the Inferior Court has contracted, in this State, as any one familiar with its history knows. When, therefore, bonds which the Court was authorized by law to issue, were, in fact, put in cir-

culation, executed as such contracts usually were, and made upon their face negotiable, a *bona fide* holder of them is not chargeable with concealed defects or irregularities. Whether the signatures of the members of the Court were all attached at the same time or not, could not appear upon the face of any bond, and one who took it without notice of such defect would be free from such a defense. In this State, bonds payable to order or bearer, have stood upon the footing of commercial paper since our Judiciary Act of 1799: See Prince Digest, 426. But even in the other States papers of this character are *now*, by universal consent, put upon this footing, and the *bona fide* holder stands like the *bona fide* holder of a promissory note. If the paper is right upon its face, a purchaser cannot be charged with irregularities, in the issue of which he has no notice: Com. of Knox county *vs.* Aspinwall, 21 Howard, 539; Curtis *vs.* County of Butler, 24 Howard, 436; Woods *vs.* Lawrence, 1 Black, 386; Moran *vs.* Commissioners, 2 Black, 732; 1 Wallace, 291; *Ibid.*, 385; 3 Wallace, 96; 9 *Ibid.*, 414; 13 *Ibid.*, 305; 14 *Ibid.*, 282.

3. We recognize the propriety of publicity in acts by public officers of this character, and without question it would have been more formal and regular for the Court to have passed an order and put it on the minutes, declaring the amount of the subscription, the date, numbers and denomination of the bonds, etc. But this order was not any part of the power of the Court to issue the bonds. The power and authority came from the Legislature and the people. The order would have been only a more complete and regular mode of doing it. In the case of *House vs. The Justice*, 20 *Georgia*, 328, this Court held, in effect, that the Inferior Court might make a parol contract, and that it is not a *necessity* that its action in such a matter should appear on the minutes. In other words, the contract of the county, if signed by the Justices, was not invalid because not mentioned on the minutes. The determination of the Court as to the amount they would subscribe, and the character of the bonds, was made, as Mr. Smith testifies, when they were all together. The mere man-

ual act of signature might well be done separately, and perhaps at last the delivery of the bonds, in answer to the call of the company, was the real issue, and it does not appear when or how that was done.    But, as we have said, these bonds are commercial paper.    Our Act of 1799 makes them so in terms, and the Courts now almost universally so consider them.    And if so, the purchaser of them has only to inquire into the authority of the Inferior Court of Floyd county to issue bonds. If they had the authority and the bonds with their official signatures to them were issued by them, the holder of the bonds is not bound to inquire further.

4. That the bonds passed by Shorter's indorsement is well settled: See 1 *Kelly,* 418 ; 16 *Georgia,* 458.

Judgment affirmed.